IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:20-CR-167-FDW-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>COLLINS ARCELL SULLIVAN, )<br>)<br>Defendant. ) | **MEMORANDUM AND**<br>**RECOMMENDATION** |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion To Suppress And Incorporated Memorandum Of Law; Request For Hearing" (Document No. 12) filed August 12, 2020. The United States filed its "Government's Response To Defendant's Motion To Suppress" (Document No. 15) on August 24, 2020. An evidentiary hearing was held before the undersigned on September 30, 2020, with Defendant personally present with counsel. Having carefully considered the briefs, testimony, evidence, and oral arguments, the undersigned will respectfully recommend that Defendant's motion be denied.

### I. PROCEDURAL HISTORY

On May 20, 2020, Defendant Collins Arcell Sullivan ("Defendant") was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Document No. 1). Defendant, through counsel, filed a "Motion to Suppress and Incorporated Memorandum of Law; Request for Hearing" (Document No. 12) on August 12, 2020, seeking to suppress certain government evidence in the case. The "Government's Response to Defendant's Motion

to Suppress" (Document No. 15) was filed on August 24, 2020.  The Court noticed a hearing on the matter.

The motion came on for a hearing on September 30, 2020, at which time several witnesses were presented by both sides.  The Government also presented body-worn camera footage from officers on the scene of the challenged encounter.  The principal question presented by the Defendant's motion is whether, based upon the information available to them, law enforcement had reasonable suspicion to approach Defendant in a barber shop, take him outside, and conduct a frisk of his person.  It was that frisk that ultimately led to the seizure of the firearm that forms the basis of the charge.

## II.  FACTUAL SUMMARY

As noted, the Court conducted a hearing on this matter on September 30, 2020, at which both the Government and Defendant presented evidence and argument.  The Government presented the testimony of two law enforcement officers – Detective Charles Hastings and Officer Ben Condron of the Charlotte-Mecklenburg Police Department ("CMPD").  Defendant presented the testimony of Fred Caldwell, a private citizen and relative of Defendant, Kenneth Edwards, a private citizen and cousin of Defendant, and Defendant himself, Collins Sullivan.  Evidence also included cross-examination of the witnesses, as well as the Government's presentation of two exhibits, including body-worn camera footage from two officers on the scene.

First, the Government presented the testimony of Detective Charles Hastings and Officer Ben Condron.  Detective Hastings has been employed with CMPD for approximately 22 years, during which time he initially worked in patrol and later transitioned to investigations, specifically as a detective in the gangs unit.  Detective Hastings has approximately 18 years of experience in gangs, narcotics, and firearms-related investigations.  Officer Condron has been an officer with

CMPD for approximately eight years, the entire duration of which he has spent working in the Freedom Division – which includes the Wilkinson Boulevard area – first in patrol and now on assignment in the crime reduction unit. Officer Condron responds to many calls in the Wilkinson Boulevard area for both gang-related activity and drug and violent crime offenses.

On March 13, 2020, Hastings was working in the Wilkinson Boulevard area, parked in an unmarked Ford Explorer on assignment to locate a wanted subject in a separate matter. On that same day, Condron was parked in a marked patrol vehicle in uniform in an adjacent parking lot to Hastings. Condron was standing by ready to assist the gang detective unit that was working on the operation described by Hastings.

At approximately 2:30 pm, Hastings was in the shopping center parking lot waiting for communication from other undercover detectives in the gang unit who were watching a residence behind the shopping center to locate the wanted subject in the unrelated operation. During his time in the parking lot, Hastings observed a black Jeep Grand Cherokee stop about ten feet from Hastings's parking spot to drop off two individuals. Hastings identified the two men that got out of the car from the front and back passenger sides, respectively, as Defendant Collins Sullivan and one of Defendant's witnesses, Kenneth Edwards. Hastings recognized both individuals from his work with the gang detectives unit, as he alleged during testimony that both Sullivan and Edwards were part of a group called the Tiggy Boys. The Tiggy Boys, including Sullivan and Edwards, were well known to law enforcement, and Hastings had particular experience with the group related to drug and firearm possession and robberies.

Hastings detailed his observations of Sullivan and Edwards getting out of the Jeep. Sullivan emerged from the Jeep, appearing to hold his crotch area and conceal an item between his legs, which appeared to be inside of his pants. Both Sullivan and Edwards walked towards the Woozs

3

barbershop, and Sullivan continued holding his hand in the crotch area of his pants. At that point, Hastings communicated with the other officers via radio, including Officer Condron, regarding his observations of Sullivan and Edwards and the fact that he knew of them through his gang investigations work, identifying them both by name. Hastings also provided Officer Condron and the other officers a description of the Jeep vehicle from which they emerged. Condron immediately checked his police database and confirmed that Defendant Sullivan was a convicted felon with a gang affiliation. Condron also testified that in his experience as an officer, if an individual possesses a concealed firearm, nine out of ten people keep the firearm concealed in the front section of their pants waistband. During cross-examination, Hastings testified that he did not recognize the driver of the Jeep.

A few minutes later – in Hastings's recollection, less than five minutes later, and in Condron's recollection, less than 15 minutes later – CMPD officers conducted a traffic stop on the Jeep vehicle (the vehicle that Sullivan and Edwards got out of) after the driver of the vehicle failed to fully stop at a stop sign on Ashley Road, approximately 1.5 miles behind the shopping center parking lot. During that traffic stop, officers recovered narcotics and a firearm. Hastings communicated with other officers regarding both his observations of Sullivan holding his crotch area while walking into the barbershop and the information he had learned concerning the recovery of the narcotics and the firearm from the vehicle that Sullivan and Edwards had been in. Other CMPD officers arrived in the parking lot of the shopping center (where the barbershop was located) following Hastings's communication with them. Upon the officers' arrival, Sullivan and Edwards were still inside the barbershop. On cross-examination, Officer Condron testified that the complaint number associated with the traffic stop indicates that the Jeep was stopped at 2:56 pm.

4

Some time - approximately 30 minutes according to Hastings and Condron – passed while officers waited for Sullivan and Edwards to leave the barbershop.[1] Initially, according to Hastings's testimony, the officers' plan was to wait to approach Sullivan and Edwards once they left the barbershop. Eventually, for safety reasons, officers made the decision to send an undercover officer into the barbershop to confirm Sullivan and Edwards remained inside, followed by the entry of uniformed officers. Both Hastings and Condron entered the barbershop – according to the body-worn camera footage, at 3:48 pm – along with other uniformed officers, totaling approximately five officers inside the barbershop. Hastings spoke to the manager of the barbershop to explain the situation while Officer Condron and a separate officer approached Sullivan and Edwards, respectively, without weapons drawn. Condron addressed Defendant Sullivan by name and placed his hands in handcuffs after standing him up, believing Sullivan to be armed in a small barbershop. At no point inside the barbershop did Condron indicate to Sullivan that he was under arrest. Condron testified that although in his recollection Defendant's pants did not appear baggy or loose, they were sagging.

Condron and Sullivan stepped outside the barbershop, and according to Condron, without instruction or leading, Sullivan of his own volition pushed his abdomen area against the exterior wall of the barbershop. Officer Condron testified that he made the decision to step outside with Sullivan because of safety concerns. Condron also testified that through his experience as a CMPD officer, he has learned that individuals concealing contraband from police usually move their bodies in ways such that the contraband is turned away from the officer. Condron backed Sullivan away from the wall so that he could start a Terry frisk pat down of Sullivan's outer clothing based

---

[1] According to Defendant and Defendant's witness, Caldwell, Defendant and Edwards waited approximately one hour inside the barbershop prior to Sullivan's haircut. Moreover, the body-worn camera footage indicates that the officers walked into the barbershop at around 3:48 pm.

on Condron's testimony that he believed Sullivan to be armed. The body-worn camera footage shows Condron repeatedly instructing Sullivan to back away from the wall. During the frisk, Sullivan without being asked indicated to the officer that he was in possession of marijuana on his person in his back left pocket of his pants – saying, "I have some weed on me." Condron then reached into the pocket to retrieve the marijuana, at which point Sullivan told Condron that he also had a scale in his front right pocket. Condron retrieved the scale and began searching Sullivan's person based on the recovery of the drugs and the scale.

The search of Sullivan's person revealed a firearm that Sullivan had concealed in his boxer shorts on the left front side of his pants. Condron seized the firearm and instructed Sullivan at that point that he was under arrest. The entire encounter – from Condron initially approaching Sullivan in the barbershop to the recovery of the firearm from Sullivan's waistband – lasted approximately five minutes. Simultaneously, Edwards was also being frisked by another officer; however, at no point during the frisk did officers uncover any contraband from him, and Edwards was not taken into custody. Sullivan was then transported to CMPD offices for interviews.[2] The Government's two exhibits containing the body-worn camera footage show the scene just described. The body-worn cameras were turned on approximately at the moment the officers walked into the barbershop, and they were turned off at the point Sullivan was taken into custody in the patrol car, following recovery of the firearm. Each video lasted approximately 5 minutes, representing the length of the brief detention period.

At the hearing, Defendant presented the testimony of Fred Caldwell, whose stepson is Defendant Sullivan's brother. Caldwell also knew Sullivan while growing up. Caldwell is the Woozs barbershop owner and regularly cuts Sullivan's hair. On March 13, 2020, Caldwell

---

[2] The parties agree that no separate Miranda warnings argument is at issue regarding Defendant's interview at the police station.

testified that Sullivan had to wait approximately an hour for his haircut because other customers were there before him. Caldwell denied that Sullivan was holding his crotch area when he walked into the barbershop. After beginning to cut Sullivan's hair, Caldwell testified that approximately four officers walked into the barbershop, two of whom approached Sullivan, put him in handcuffs, and asked him to step outside. During Officer Condron's frisk of Sullivan outside of the barbershop, Caldwell remained inside.

Defendant next presented the testimony of Kenneth Edwards, a cousin of Defendant Sullivan, who was with him on March 13, 2020. Edwards testified he has known Sullivan for approximately ten years. Edwards got out of the black Jeep Cherokee with Defendant Sullivan, as Hastings testified. Edwards testified that prior to arrival in the parking lot of the barbershop, he and Sullivan were at a funeral, and a friend gave them a ride to the barbershop from the funeral. Edwards testified that he was not aware of any drugs or firearms in the vehicle. Edwards described walking into the barbershop and waiting to get his hair cut, as Sullivan had his hair cut first by Caldwell. While waiting, Edwards fell asleep. When he woke up, approximately three or four CMPD officers had entered the barbershop, placing both Edwards and Sullivan in handcuffs and escorting the two of them outside. Officers patted Edwards down during the frisk and no contraband was recovered. Edwards testified that he was then released.

Defendant Sullivan then testified himself. Sullivan denied awareness of seeing any guns or smelling any marijuana in the Jeep vehicle in which he rode from the funeral to the barbershop. Defendant Sullivan described walking into the barbershop and waiting almost an hour to get his hair cut. Sullivan then testified that it is normal for him to walk with his pants sagging and indicated that his pants were sagging on the day of the frisk, as he was not wearing a belt and had no holster. Once inside the barbershop, Sullivan alleged that the police officers grabbed his arms

7

and took him outside and pushed him against the wall and began to pat down his legs, at which point he told them he had marijuana and a scale. He later detailed the subsequent search that uncovered the firearm on his left hip, after which point he was transported to an interview room for questioning. Sullivan denies that he was initiated into a gang – he disputes the officers' characterization of the Tiggy Boys as a gang, describing the group instead as a music group with which he used to rap. On cross-examination, Sullivan admitted that he was a convicted felon in possession of a firearm on March 13, 2020.

### III. STANDARDS OF REVIEW

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or Terry stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); United States v. Sokolow, 490 U.S. 1, 7 (1989); Terry v. Ohio, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

Reasonable suspicion means something "more than an 'inchoate and unparticularized suspicion or 'hunch''" but "less…than probable cause." Wardlow, 528 U.S. at 123-24 (quoting Terry, 392 U.S. at 27). In order to meet this burden, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," establish reasonable suspicion of criminal activity. Terry, 392 U.S. at 21. The Fourth Circuit describes the reasonable suspicion standard as a "commonsensical" one, thus giving credit to "the practical experience of officers who observe on a daily basis what transpires on the street." United

8

Case 3:20-cr-00167-FDW-DCK    Document 22    Filed 01/26/21    Page 8 of 15

States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). Courts evaluating the totality of the circumstances to determine whether an officer had reasonable suspicion can credit as one factor in such analysis officers' "own experiences and specialized training [allowing them] to make inferences from and deductions about the cumulative information available." Arvizu, 534 U.S. at 266. The standard is not an exacting one – given that "the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous." Park v. Shiflett, 250 F.3d 843, 850 (4th Cir. 2001).

The Supreme Court has described "probable cause" to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). However, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232.

The probable cause standard does not:

> require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

Taylor v. Farmer, 13 F.3d 117, 121-22 (4th Cir.1993); accord Ornelas v. United States, 517 U.S. 690, 696 (1996) (probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found").

Whether an officer has probable cause to arrest also "involves an inquiry into the totality of the circumstances." United States v. Humphries, 372 F.3d 653, 657 (4th Cir. 2004) (citing Maryland v. Pringle, 540 U.S. 366 (2003)); see Gates, 462 U.S. at 230-31. A warrantless arrest of

9

an individual in a public place is justified where supported by probable cause. Humphries, 372 F.3d at 657; accord Pringle, 540 U.S. at 370 ("[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause"); United States v. Watson, 423 U.S. 411, 424 (1976); United States v. Dickey-Bey, 393 F.3d 449, 453 (4th Cir. 2004) ("[i]t is well-settled under Fourth Amendment jurisprudence that a police officer may lawfully arrest an individual in a public place without a warrant if the officer has probable cause to believe that the individual has committed, is committing, or is about to commit a crime"); United States v. McCraw, 920 F.2d 224, 227 (4th Cir. 1990).

The Supreme Court has long recognized an exception to the warrant requirement of the Fourth Amendment for searches incident to a lawful arrest. Michigan v. DeFillippo, 443 U.S. 31, 35-36 (1979); United States v. Robinson, 414 U.S. 218, 224 (1973); Chimel v. California, 395 U.S. 752, 762-63 (1969); United States v. Nelson, 102 F.3d 1344, 1346 (4th Cir. 1996). The search incident to arrest extends to the "arrestee's person and the 'area within his immediate control.'" Chimel, 395 U.S. at 763.

### IV. DISCUSSION

The question presented by Defendant's "Motion to Suppress And Incorporated Memorandum Of Law; Request for Hearing" (Document No. 12) is straightforward: did law enforcement have reasonable suspicion to approach Defendant in the barbershop, take him outside, and conduct a Terry frisk of his person. The Government argues that considering the totality of the circumstances, there were ample factors that gave rise to a reasonable, articulable suspicion to approach Defendant in the barbershop, move him outside for the safety of the barbershop patrons and the officers on the scene, and conduct a frisk of his person. Defendant argues that there was

no reasonable suspicion for officers to briefly stop and detain Defendant, and that in fact, officers subjected Defendant to an arrest and search without probable cause. Considering the totality of the circumstances, the Court agrees with the Government that officers had reasonable suspicion to conduct the frisk. During the frisk, Defendant's voluntary admission that he possessed marijuana on his person supplied probable cause to make a lawful arrest and subsequently for the officer to conduct a lawful search incident to arrest, yielding the firearm.

Defendant asserts in the pending motion that "[i]t has long been established that an officer may [] stop and/or briefly detain persons for investigative questioning where the officer has a reasonable suspicion supported by particularized articulable facts that criminal activity is afoot." (Document No. 12, p.5). Indeed, the law agrees with the Defendant on this point – to conduct a brief stop and frisk, an officer must be able to identify "specific and articulable facts which, taken together with rational inferences from those facts" give rise to the conclusion that "in light of [the officer's] experience[,] criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." Terry, 392 U.S. at 21, 30. Defendant, however, argues that in this case, officers did not possess reasonable suspicion to stop and detain him, as Defendant argues that there "ha[ve] been no particularized articulable facts" to suggest that "Mr. Sullivan had in fact committed or was committing a crime." (Document No. 12, pp. 5-6, 14). Moreover, Defendant argues that he and Edwards were not merely stopped and frisked but rather subjected to an unlawful arrest without probable cause. In Defendant's view, the officers' approach to Defendant and Officer Condron's movement of Defendant from his barbershop seat converted the encounter into an unlawful arrest. Defendant cites for this proposition a variety of cases, including United States v. Mendenhall, arguing that the test for an arrest articulated in that case indicates that officers placed Defendant under arrest here because there was application of physical contact

11

between the officers and Defendant to move outside and out of the barbershop chair. 446 U.S. 544, 554 (1980).

However, mere movement of an individual for safety reasons that an officer plans to frisk does not convert the frisk into an arrest.  See Florida v. Royer, 460 U.S. 491, 504-505 (1983) ("there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area"); accord United States v. Hamlin, 319 F.3d 666, 671 (4th Cir. 2003) ("During Terry stops, officers may take 'steps reasonably necessary to maintain the status quo and to protect their safety,'" including the use of handcuffs (quoting United States v. Sinclair, 983 F.2d 598, 602 (4th Cir. 1993)).  Officer Condron stated during testimony that the decision to move Sullivan outside the barbershop was made because of safety concerns for barbershop patrons and officers. Respectfully, the Court cannot agree with Defendant's arguments.  Ample factors described below in light of the totality of the circumstances supported officers' reasonable suspicion that criminal activity was afoot, justifying the brief detention and frisk.

As argued in the Government's brief in response to Defendant's pending motion, various factors, considered together, gave rise to "reasonable suspicion to believe that the defendant had recently been involved in criminal activity at the time that he was walking into the Barbershop." (Document No. 15, p.4).  The Government cites United States v. George for the proposition that "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." 732 F.3d 296, 300 (4th Cir. 2013).  Here, those factors were plentiful.

Detective Hastings observed Defendant appearing "to be holding a concealed item in [the] groin area of his pants." (Document No. 15, p. 4).  Furthermore, Hastings and Condron were

12

acquainted with Sullivan, identifying Defendant as a convicted felon with a gang affiliation. Although Defendant's counsel on cross-examination of Officer Condron suggested that a criminal offense is not necessarily being committed just because one has a prior history, the Fourth Circuit's decision in <u>United States v. Davis</u> expressly indicates that although "standing alone" prior criminal record is insufficient to formulate reasonable suspicion, a "criminal history [can be] but one of several factors that contributed to [an officer's] reasonable suspicion." 742 Fed. App'x 714, 716 (4th Cir. 2018). Moreover, after Sullivan's entry into the barbershop, CMPD officers conducted a traffic stop on the vehicle in which Sullivan had been riding and recovered a firearm and narcotics. Condron's near decade of experience in the Wilkinson Boulevard area, responding to numerous calls concerning drugs, gangs, and firearm activity, contributes to the reasonable suspicion as well. <u>See George</u>, 732 F.3d at 300 ("although general evidence that a stop occurred in a high-crime area, standing alone, may not be sufficiently particularized to give rise to reasonable suspicion, it can be a contributing factor"). Finally, Detective Hastings and Officer Condron's multiple years of experience and combined expertise in gang investigations and drug and firearm-related activity and Hastings's prior encounters with Defendant fit well within the Fourth Circuit's "crediting [of] the practical experience of officers who observe on a daily basis what transpires on the street" in the reasonable suspicion analysis. <u>Lender</u>, 985 F.2d at 154.

As stated in the Government's response brief to the pending motion, "[o]nce the defendant made the statement that he had marijuana in his pocket, officers would be permitted in seizing the item and arresting the defendant for the possession of marijuana and were permitted to search the defendant for additional contraband." (Document No. 15, p.6). Defendant's voluntary admission of his possession of drugs provided probable cause for Defendant's arrest, and thus for a further search of Defendant's person incident to that arrest, beyond the mere pat down involved in the

13

Terry frisk. See United States v. Currence, 446 F.3d 554, 556 (4th Cir. 2006) ("when law enforcement officers have probable cause to make a lawful custodial arrest, they may—incident to that arrest and without a warrant—search 'the arrestee's person and the area 'within his immediate control''" (quoting Chimel, 295 U.S. at 763); accord Robinson, 414 U.S. at 224. As a result, Officer Condron's recovery of the firearm on Defendant's left hip in his boxer shorts as a result of the lawful search incident to arrest was entirely proper.

## V. CONCLUSION

The facts and legal issues here are thus straightforward. The undersigned finds based on the totality of the circumstances that the officers had reasonable suspicion to approach Defendant and conduct a lawful frisk of his person. The officers' subsequent seizure of the firearm followed directly upon the frisk; it was a lawful search incident to arrest and is therefore permissible.

## VI. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Defendant's "Motion To Suppress And Incorporated Memorandum Of Law; Request For Hearing" (Document No. 12) be **DENIED**.

## VII. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed. R. Civ. P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the

District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005).  Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenhour, 889 F.2d 1363, 1365 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), reh'g denied, 474 U.S. 1111 (1986).

**IT IS SO RECOMMENDED.**

Signed: January 26, 2021

David C. Keesler
United States Magistrate Judge

15
Case 3:20-cr-00167-FDW-DCK   Document 22   Filed 01/26/21   Page 15 of 15